UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

In the Matter of the Extradition of    )
    )   Misc. No.   3:21MC22(SALM)
Jacob Mazeika    )

## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to the Kingdom of the Netherlands (the "Netherlands"), respectfully requests that the fugitive in this case, Jacob Mazeika ("Mazeika"), be held without bond pending receipt of the formal request for extradition and the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq.* This memorandum summarizes the framework of extradition law in the United States, and sets forth the reasons why Mazeika should be detained. In short, Mazeika should be detained pending the extradition hearing in this matter, and thereafter if the Court enters an order finding him extraditable, because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community, and that special circumstances warrant his release.

## BACKGROUND

The Netherlands seeks Mazeika's provisional arrest, with a view toward his extradition to face prosecution for several offenses in connection with the November 26, 2019, murder of a businessman in the Netherlands.[1] On February 20, 2020, the Public Prosecutor of the Judicial

---

[1] The Dutch offenses are: (1) (preparation of) murder, in violation of Dutch Criminal Code ("DCC") Articles 289 and 46; (2) incitement and/or accessory to murder, in violation of DCC Articles 289, 47, and/or 48; (3) (preparation of) aggravated manslaughter, in violation of DCC Articles 288 and 46; (4) incitement and/or accessory to aggravated manslaughter, in violation of DCC Articles 288, 47, and/or 48; (5) (preparation of) manslaughter, in violation of DCC Articles

District of Maastricht, Mr. M.M.M. Smits, a judicial authority authorized to issue arrest warrants under the laws of the Netherlands, issued a warrant for Mazeika's arrest for these offenses.   The provisional arrest request provides the following facts:

On November 26, 2019, at around 3:35 p.m., Dutch authorities received an emergency call to go to a residential address at Roefsstraat in Bergen, Limburg, the Netherlands, which was the home of Thomas Schwarz (the "victim").   After the victim failed to report to work that morning, Witness-1, one of the victim's colleague's visited the victim's home that afternoon.   Upon Witness-1's arrival, he found the victim's front door open and the door handle stained with blood. At around 3:53 p.m., Dutch authorities arrived at the victim's home to find the victim's body lying on the floor next to his dining room table with his hands and feet tied with wire and his body surrounded by blood.   On the ground, behind the victim's body, there was a laptop and wallet containing several credit cards.   The autopsy revealed that the victim had sustained multiple injuries.   The victim had a few deep stab wounds, including wounds to his right upper leg and right

---

287 and 46; (6) incitement and/or accessory to manslaughter, in violation of DCC Articles 287, 47, and/or 48; (7) (preparation of) extortion, resulting in death, in violation of DCC Articles 317 and 46; (8) (preparation of) attempted extortion, resulting in death, in violation of DCC Articles 317, 45, and 46; (9) (preparation of) theft with violence, resulting in death, in violation of DCC Article 312; (10) incitement and/or accessory to theft with violence, resulting in death, in violation of DCC Articles 312, 47, and/or 48; (11) (preparation of) premeditated grievous bodily injury, resulting in death, in violation of DCC Articles 303 and 46; (12) incitement and/or accessory to premeditated grievous bodily injury, resulting in death, in violation of DCC Articles 303, 47, and/or 48; (13) (preparation of) grievous bodily injury, resulting in death, in violation of DCC Articles 302 and 46; (14) incitement and/or accessory to grievous bodily injury, resulting in death, in violation of DCC Articles 302, 47, and/or 48; (15) (preparation of) premeditated physical abuse, resulting in death, in violation of DCC Articles 301 and 46; (16) incitement and/or accessory to premeditated physical abuse, resulting in death, in violation of DCC Articles 301, 47, and/or 48; (17) intentional deprivation of liberty, in violation of DCC Article 282; (18) hostage-taking, in violation of DCC Article 282a; and (19) threat of a criminal offense, in violation of DCC Article 285.

upper arm.  He also had serious injuries to his back, and his ribs were broken.  In addition, his throat had been cut, causing him to lose a great deal of blood.

Witness-1 told Dutch authorities that four to five weeks before November 26, 2019, according to the victim, the victim arrived home to encounter two English-speaking individuals, who requested money from him.  After the victim told the two individuals that he would not give them money, the two individuals stated that another individual, who was not as friendly, would return to request money from him.  The victim spoke with Witness-1 on November 25, 2019, the day before his murder, but he did not mention to Witness-1 that anything was wrong.

Statements collected from the victim's neighbors suggested that on the morning of November 26, 2019, sometime before 7:00 a.m., a Volkswagen Polo with license plate number ████████ pulled up to Keulerstraat, a street that runs perpendicular to the victim's home on Roefsstraat.  Two men exited the car and walked toward Roefsstraat, while a third man remained in the car.  A neighbor on Roefsstraat ("Witness-2") heard the victim's front door slam as well as various voices of different people in the victim's home, some speaking German, and others that Witness-2 recognized as the voices of the victim and, Witness-2 believed, the victim's girlfriend.  After a few minutes, Witness-2 heard a loud bang and yelling coming from the victim.  Witness-2 then went to the victim's home and rang his doorbell, but no one opened the front door.  When Witness-2 looked through the living room window, Witness-2 saw one person bent over, holding a sheet or blanket, as well as a woman, who Witness-2 believed to be the victim's girlfriend; however, Dutch authorities have since confirmed that the victim's girlfriend could not have been present at the time of the murder.  Witness-2, after returning to Witness-2's home, noticed the same Volkswagen Polo enter Roefsstraat and stop at the front of the victim's home.  A woman left

the victim's home, slammed the front door, and entered the Volkswagen Polo, which then promptly drove away.  According to another neighbor of the victim ("Witness-3"), the Volkswagen Polo entered Gildenstraat, which runs parallel to Roefsstraat, after abruptly driving away at around 7:15 a.m.  At around 7:35 a.m., Witness-3 noticed a man walking to the Volkswagen Polo calling out to others in English to "come with the car."  The man then drove the Volkswagen Polo onto Roefsstraat, where two men, wearing hats, entered the Volkswagen Polo.

Because the victim was a German national and the Volkswagen Polo featured a German license plate number, the Dutch authorities contacted German authorities to gather more information.  The German authorities revealed that, on November 24, 2019, at around 6:00 p.m., two men, Justin Steven Causey and the German-speaking Lukas Fecker, rented the Volkswagen Polo with license plate number ████ from the German rental car company Call & Drive Autovermieting GmbH in Frankfurt, Germany.   Camera images from Call & Drive Autovermieting GmbH on November 24, 2019, display two men who resemble Causey and Fecker.  On November 26, 2019, at around 1:24 p.m., Causey, using the mobile phone number +1970████ (the "970 number"), called Call & Drive Autovermieting GmbH to ask if he could return the Volkswagen Polo.  According to the rental agent at Call & Drive Autovermieting GmbH, Causey returned the Volkswagen Polo at around 1:30 p.m., but without the car's four floor mats. Causey stated that he had cleaned the floor mats but he had forgotten to put them back in the car before returning it.

Based on this information, Dutch authorities formally opened an investigation into Causey and the 970 number.  Historic telephone data collected from phone transmission masts in Bergen, Netherlands, revealed that the 970 number appeared in the vicinity of the crime scene on November

19-21, 2019, as well as on the day of the murder.  Cell phone investigation and mast data show that on November 26, 2019 at around 6:30 a.m. and 7:16 a.m., the 970 number sent a signal to the mast that covers the area that includes the victim's home.

Additional telephone data showed that on November 25, 2019, at around 5:45 p.m., the 970 number crossed the border along autobahn 61 from Germany into Venlo, Netherlands.  This telephone data matched prior GPS data from German authorities, which showed that the Volkswagen Polo with license plate number FW1457 crossed the border from Germany into Venlo, Netherlands, on November 25, 2019, at around the same time as the 970 number.  Further analysis of the 970 number showed that the WhatsApp account associated with this phone number contained a photo of a male resembling Causey, and consistent with camera images of Causey from Call & Drive Autovermieting GmbH.

Historic print data and video images show that on dates between November 19 and 26, 2019, Causey stayed at the Van der Valk hotel in Molenhoek, Netherlands, which is approximately 15.5 miles away from Bergen, Netherlands.  Video images and historical telephone data show that Causey stayed in the Van der Valk hotel with one individual on dates between November 19-22, 2019, and was pictured twice with a second individual who stayed in the direct vicinity of the victim's home in Bergen.

Additional historic print data obtained from German authorities shows that on November 26, 2019, at around 8:22 a.m., Causey traveled across the border from Venlo, Netherlands, into Germany, until he reached Frankfurt, where the Volkswagen Polo was returned to Call & Drive Autovermieting GmbH.  Forensic examination of the Volkswagen Polo by German authorities revealed trace amounts of blood in the car.  Further laboratory examination showed that the trace

amounts of blood found in the car matched blood samples from the victim.

Later, Dutch authorities obtained information from U.S. authorities pursuant to a mutual legal assistance request, regarding Causey's status in the United States.  Information provided by the U.S. authorities revealed that Causey had been arrested in Colorado, in December 2020, on Colorado State charges of drug and firearms possession.  The FBI informed the Dutch authorities that when Causey was arrested in December 2020, he stated that he was doing protection work for Lukas Fecker, a resident of Switzerland and owner of the company "Innovation Brain."  A supplemental mutual legal assistance request sent to the United States requesting Causey's bank records revealed that on December 27, 2019, Credit Suisse Bank, on behalf of Innovation Brain, deposited $5,980 USD into Causey's bank account.

Lukas Fecker's company, Innovation Brain, buys companies on the verge of bankruptcy. It appears that the victim owned Taurus Farms, in North Macedonia, which was in financial trouble.  Dutch authorities believe it likely that the victim and Fecker had a business relationship, and that the victim possibly owed Fecker money.  Fecker is currently detained and awaiting trial in the Netherlands, in connection with his role in the crimes described herein.

Additional historic telephone data collected from phone transmission masts in Molenhoek, Netherlands, revealed that the phone number +1201████ (the "201 number") appeared in the vicinity of the Van der Valk hotel from November 25-26, 2019.  The user of the 201 number followed the same physical route as Causey and the 970 number, including the vicinity of the crime scene on the day of the murder.  Specifically, the 201 number appears on (1) November 25, 2019: (a) at approximately 5:45 p.m., southeast of Venlo, Netherlands; and (b) between approximately 7:36 p.m. and 8:43 p.m., at the Van der Valk hotel; and (2) on November 26, 2019:  (a) at

approximately 6:30 a.m., in the vicinity of the crime scene, the Roefsstratt in Bergen; and (b) at approximately 8:22 a.m., near the border crossing at Venlo into Germany.

An open source investigation that Dutch authorities conducted into the 201 number, using the website Truecaller.com, revealed Mazeika as the suspected user of the 201 number. Pursuant to a Dutch mutual legal assistance request, U.S. authorities confirmed that this number is associated with Mazeika. Specifically, Mazeika provided the 201 number to the individual who, until 2019, was his landlord in Jersey City, New Jersey, for purposes of contacting him.

Further analysis of the camera images obtained from the Van der Valk hotel shows that two men, including Mazeika, accompanied Causey on the night of November 25, 2019, and the early morning of November 26, 2019. The Van der Valk hotel camera images show Causey, Mazeika, and a third suspect ("Individual-3") arriving at the hotel in Molenhoek on November 25, 2019 at 7:07 p.m. and leaving the hotel on November 26, 2019, at 6:02 a.m. Images from the hotel show: (1) the three men checking into the hotel the night before the murder; and (2) the following morning, at 6:02 a.m., three men leaving the hotel. The first has a shaved head consistent with the photo of Individual-3 from the previous night; the second is slim with dark hair and facial hair, consistent with the hotel surveillance photo of Mazeika from the previous night; and the third man, who is heavier than the second, has a full head of lighter-colored hair and appears to be wearing a black and electric-blue jacket, consistent with the photo of Causey from the previous night; and (3) one minute later, at 6:03 a.m., a car whose appearance is consistent with a white VW Polo driving out of the hotel parking lot.

Later, Dutch authorities obtained information from German and U.S. authorities pursuant to a mutual legal assistance request regarding Mazeika's travel history. Flight information

provided by German authorities from the airline company, Eurowings, shows that on November 24, 2019, Mazeika boarded flight EW1113 from Newark, New Jersey to Dusseldorf, Germany, which arrived at 6:05 a.m. on November 25, 2019.  Booking records indicate that both flight reservations were made on November 24, 2019, at 12:14 a.m., listing lukasfecker4@checkinaddress and the 970 number in the contact information.  On November 28, 2019, Mazeika returned to the United States, flying from Zurich, Switzerland to New York via Moscow, Russia.

Information obtained from U.S. authorities via a request for mutual legal assistance showed that Mazeika used a personal debit and/or credit card to make purchases at the Newark International Airport on November 24, 2019, the Düsseldorf International Airport on November 25, 2019, the Vnukovo International Airport in Moscow, Russia, on November 28, 2019, and again in the United States (specifically, Connecticut) on November 29, 2019.

The Netherlands has requested Mazeika's provisional arrest with a view toward extradition pursuant to the extradition treaty between the United States and the Netherlands (the "Treaty").[2] The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Mazeika's arrest. This Court

---

[2] *See* Extradition Treaty Between the United States of America and the Kingdom of the Netherlands, U.S.-Neth., June 24, 1980, 35 U.S.T. 1334 ("the 1980 Treaty")*, as amended by* the Agreement comprising the instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed at Washington on 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and the Kingdom of the Netherlands signed at the Hague on 24 June 1980, U.S.-Neth., Sept. 29, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Agreement"), *with* Annex (collectively, the "Treaty"), and related exchange of notes.  The Annex reflects the integrated text of the provisions of the 1980 Treaty and the Agreement.

issued the arrest warrant on or about April 23, 2021, and Mazeika was arrested today, April 27, 2021. Mazeika is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

### I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

#### A.   The limited role of the Court in extradition proceedings

Extradition is a means by which a fugitive is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment. In the United States, international extradition is primarily an executive function, with a limited role carved out for the judiciary pursuant to the federal extradition statute. *See* 18 U.S.C. § 3184. Under 18 U.S.C. § 3184, the judicial officer's inquiry is confined to whether (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers the crimes for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to the offenses for which extradition is sought. *See id.*; *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *see also Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir. 2011). "If the judicial officer answers these questions in the affirmative, he or she 'shall certify' the extraditability of the fugitive to the Secretary of State." *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000) (quoting 18 U.S.C. § 3184).

After a court certifies a fugitive as extraditable, the Secretary of State decides whether the fugitive will be surrendered to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial

resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

**B.      The requirements for certification**

   1.      <u>Authority of the Court over the proceedings</u>

   The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  Both magistrate judges and district judges may render a certification under Section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Local Rule 72.1(B) ("The Magistrate Judge . . . may also conduct extradition proceedings.").

   2.      <u>Jurisdiction over the fugitive</u>

   The Court has jurisdiction over a fugitive, such as Mazeika, who is found within its jurisdictional boundaries.  *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

   3.      <u>Treaty in full force and effect</u>

   Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See, e.g.*, *In re Chan Kam-Shu*, 477 F. 2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F. 3d 165, 171 (3d Cir. 1997).  The government will satisfy this requirement at the extradition hearing

by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and the Netherlands.  The State Department's conclusion that a treaty is in full force and effect is entitled to deference.  *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight").

            4.    Crimes covered by the Treaty

        Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances the treaty defines.  Here, the Treaty defines extraditable offenses as  (a) offenses "referred to in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties"; and (b) offenses, "whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States of America and the laws of the Kingdom of the Netherlands."  Treaty Art. 2(1).  The Appendix to the Treaty expressly provides for extradition for offenses including murder, assault with intent to commit murder, manslaughter, malicious wounding, inflicting grievous bodily harm, kidnapping, false imprisonment, robbery, larceny, and extortion.  Further, the Treaty provides that extradition "shall be granted in respect of an extraditable offense . . . [f]or prosecution, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year."  *Id.* Art. 2(2)(a).

        The requesting country need not establish that its crimes are identical to ours.  "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."  *Collins*

*v. Loisel*, 259 U.S. 309, 312 (1922); *see also, e.g., In re Pena Bencosme*, 341 F. App'x 681, 684 (2d Cir. 2009) (dual criminality requirement satisfied if "the *conduct* of the accused . . . falls within the proscription of American criminal law") (emphasis in original, internal quotation marks and citations omitted).

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933); *Skaftouros*, 667 F.3d at 155 (2d Cir. 2011); *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5.  <u>Probable cause that the fugitive has committed the offense</u>

To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that Mazeika committed the offenses for which the Netherlands seeks extradition. *See, e.g.*, *Cheung*, 213 F.3d at 88. It is well-established that "the function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which . . . would justify his apprehension and commitment for trial if the crime had been committed in that state.'" *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d Cir. 1973) (quoting *Collins*, 259 U.S. at 315); *see also, e.g.*, *Austin*, 5 F.3d at 603 ("[T]he order of extraditability expresses no judgment on [the fugitive's] guilt or innocence."); *Haxhiaj v.*

*Hackman*, 528 F. 3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.") (internal quotation marks omitted).

> C.    **An extradition hearing follows unique procedures**

Extradition hearings are neither criminal nor civil proceedings. *See, e.g.*, *Austin*, 5 F.3d at 603 ("We have repeatedly noted, for example, that an extradition hearing is not a criminal prosecution: the order of extraditability expresses no judgment on Austin's guilt or innocence."). "By design, 'the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.'" *Skaftouros*, 667 F.3d at 155 (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)).  A summary of those advantages is set forth below.

> 1.    Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings.  *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see also, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16.

Hearsay evidence is admissible at an extradition hearing.  *See, e.g.*, *Collins*, 259 U.S. at 317 ("unsworn statements of absent witnesses may be acted upon by the committing magistrate"); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same); *In re Ryan*, 360 F. Supp. 270, 273

(E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay.").   Accordingly, a certification of extraditability is properly based on the authenticated documentary evidence and information that the requesting government has provided.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (affidavits of Canadian law enforcement officers are competent and "provided ample evidence of probable cause"); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-52 (9th Cir. 1987) (relying on affidavit of Canadian prosecutor); *United States v. Amabile*, 14-M-1043, 2015 WL 4478466, at \*9 (E.D.N.Y. July 16, 2015) (stating that "the certificate of extradition may be based on written statements provided by a foreign prosecutor, investigator or judge"); *Suyanoff v. Terrell*, No. 12-cv-05115, 2014 WL 6783678, at \*8 (E.D.N.Y. Dec. 2, 2014) ("written summaries of evidence, including witness testimony, are both permitted and frequently utilized in establishing probable cause within the extradition context"); *In re Extradition of Chan Hon-Ming*, 06-M-296, 2006 WL 3518239, at \*7 (E.D.N.Y. Dec. 6, 2006) (relying on police detective's affirmation setting forth the "major facts and evidence uncovered by the Hong Kong Police").  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Shapiro*, 478 F.2d at 902.

### 2.   Limitations on Fugitives' Defenses in Extradition Proceedings

The fugitive's defenses in an extradition proceeding are heavily circumscribed.  For example, the fugitive has: (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir. 1994); (ii) no Fifth Amendment guarantee against double

jeopardy with respect to successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to confrontation or cross-examination, *see, e.g.*, *Bingham,* 241 U.S. at 517; *Skaftouros*, 667 F.3d at 155 n.16; (v) no right to invoke defenses that "savor of technicality," *see Bingham,* 241 U.S. at 517; (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913); and, (vii)  generally, no right to discovery, *see, e.g.*, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

Relatedly, a fugitive's right to present evidence is severely constrained.  "In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." *Id.*  Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro*, 478 F.2d at 901. "[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the country seeking extradition]." *Id.* at 905 (internal quotation marks omitted).

3.     Rule of non-inquiry

All matters a fugitive might raise as defenses to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court.  *See* 18 U.S.C. §§ 3184, 3186.  This is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary

of State." *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also, e.g.*, *Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990).

## II.     MAZEIKA SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.   The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.   Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal prosecution.[3]   *See, e.g.*, *Austin*, 5 F.3d at 603; *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 128 (E.D.N.Y. 2001).   Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.     Applicable law

1.     A strong presumption against bail governs in an international extradition proceeding

Unlike   in   domestic   criminal   cases,   courts   have   long   recognized   a "presumption against bail in extradition cases." *Id.*; *see In re Extradition of Rovelli*, 977 F. Supp. 566, 567 (D. Conn. 1997) ("There is a strong, and longstanding, presumption against bail in international extradition proceedings.") (citing *Wright v. Henkel*, 190 U.S. 40 (1903)); *see also, e.g., In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017) ("[T]his

---

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, and 3156(a)(2).   Here, Mazeika is not accused of "offenses" within the meaning of 18 U.S.C. § 3156, but with offenses that violate Dutch law.

is not a criminal case where bail would ordinarily be granted.").  The Supreme Court established

this presumption against bail in *Wright*, explaining that when a foreign government makes a proper

request pursuant to a valid extradition treaty, the United States is obligated to deliver the person

sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require
> it to do, is entitled to the delivery of the accused on the issue of the proper warrant,
> and the other government is under obligation to make the surrender; an obligation
> which it might be impossible to fulfill if release on bail were permitted. The
> enforcement of the bond, if forfeited, would hardly meet the international demand;
> and the regaining of the custody of the accused obviously would be surrounded
> with serious embarrassment.

 190 U.S. at 62.

When, as here, a foreign government meets the conditions of the Treaty, the United States

has an "overriding interest in complying with its treaty obligations" to deliver the fugitive.  *In re*

*Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.

It is important that the international community regard the United States as a country that honors

its agreements, so that the United States will be in a position to demand that other nations meet

their reciprocal obligations to the United States.  *See e.g., Martinelli*, 263 F. Supp. 3d at 1294 ("No

amount of money could answer the damage that would be sustained by the United States were the

appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so

determined.") (quoting *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)).  Such

reciprocity would be defeated if a fugitive flees after being released on bond.

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at

least in part, the country that is seeking the accused's presence for trial, forfeiture of bail in

international extradition cases due to the failure of the fugitive to appear would leave the

Netherlands without either remedy or compensation.  Given the United States' overriding interest, and the presumption against bail, "release on bail in extradition cases should be an unusual and extraordinary thing."  *Borodin*, 136 F. Supp. 2d at 128 (internal quotation marks and citations omitted).

2.    <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

Given the strong presumption against bail, a fugitive may not be released on bail unless he establishes that (1) he is not a flight risk or a danger to the community *and* (2) "special circumstances" warrant release.  *See, e.g.*, *Leitner*, 784 F.2d at 160; *Martinelli*, 263 F. Supp. 3d at 1292 ("For over a hundred years . . . circuit and district courts have . . . applied the 'special circumstances' test for bail determinations in extradition cases").[4]  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act."  *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F.

---

[4] Several courts have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof, *see, e.g., In re Extradition of Patel*, 08-mj-430, 2008 WL 941628, at *1 (D. Or. Apr. 4, 2008); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996); others have applied a preponderance of the evidence standard, *see, e.g.*, *Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006); and still other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g., Perez-Cueva*, 16-0233, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016).

Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at \*2 (D. Or. Apr. 4, 2008) (considering that fugitive, a physician, had "more than sufficient assets available with which to flee").

Crucially, the special circumstances inquiry is separate from considering danger to the community or risk of flight. *See Rovelli*, 977 F. Supp. at 568 ("[The fugitive] must demonstrate not merely that he is not a flight risk, but that special circumstances exist which justify his being admitted to bail.") (citations omitted). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also, e.g.*, *Borodin*, 136 F. Supp. 2d at 130 (citing cases). Likewise, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

Special circumstances must be extraordinary and not factors applicable to all individuals facing extradition. *See, e.g.*, *Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of claimed special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569; *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *Rovelli*, 977 F. Supp. at 568; *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999); *Beresford-Redman*, 753 F. Supp. 2d at 1089-90;

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at \*1, 3–4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 173-74; *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Knotek*, No. 13-9204, 2016 WL 4726537, at \*3, 7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Borodin*, 136 F. Supp. 2d at 127, 131 (State Secretary of the Union of Russia and Belarus); *Pelletier*, 2009 WL 3837660, at \*3-4 (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- Availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297–98; *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y. 1930);

- The likelihood of success at the extradition hearing, *see Sacirbegovic*, 280 F. Supp. 2d at 88; and

- Availability of bail for the same offense in the requesting country, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 172.

While, in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. *See Sacirbegovic*, 280 F. Supp. 2d at 88 (collecting cases). Such findings are highly case-specific and within the Court's discretion, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

**B.     Analysis**

The Court should deny bail because Mazeika poses a flight risk and a danger to the community, and because there do not appear to be any special circumstances that can overcome the strong presumption against bail.

Mazeika's alleged crimes in the Netherlands are extremely serious, they include, among others, (preparation of) murder, in violation of Dutch Criminal Code ("DCC") Articles 289 and 46; (2) incitement and/or accessory to murder, in violation of DCC Articles 289, 47, and/or 48. The severity of those offenses creates a strong incentive to flee.

Further, Mazeika poses a significant flight risk because he has a history of evading justice and because the instant extradition proceedings heighten his incentive to flee further.  *See, e.g.*, *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges.  The intent is the same— the avoidance of prosecution.") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)). In this case, there is probable cause to believe that Mazeika sought to obfuscate and conceal his conduct in the Netherlands by minimizing documentary proof of his activity there. Indeed, despite the Netherlands being one of Europe's largest travel hubs, Mazeika did not arrive there directly: rather, he travelled to Europe first by way of Germany, then via ground transport to the Netherlands. Likewise, his departure route was not direct from the Netherlands but involved what appears to be a deliberately circuitous route – back through Germany, and then via a series of flights back to the United States through seemingly disparate countries, specifically Russia and

Switzerland. There is no evidence that Mazeika was a tourist in Europe during the relevant timeframe, and his overly complex itinerary appears more consistent with calculated evasion and concealment of his activities in the Netherlands than with innocent behavior.

Further, now that Mazeika is aware that the Netherlands seeks his extradition from the United States, he has strong incentive to flee further, whether to a third country or to an underground location within the United states.   As noted above, the upcoming extradition proceedings have limited scope and afford Mazeika few rights, and the government's burden to establish extraditability is relatively light.  *See, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 483 (S.D. Tex. 2010) (finding that a fugitive has "virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof," he faces significant risk of extradition); *In re Extradition of Adame*, Misc. H-13-287, 2013 U.S. Dist. LEXIS 41682, at *7-8 (S.D. Tex. Mar. 25, 2013) (same); *see also, e.g.*, *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he [fugitive] is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").  The conduct for which the Netherlands seeks extradition carries a potential penalty of life imprisonment. Accordingly, no combination of bail conditions or promises can ensure Mazeika's appearance before this Court and the United States' ability to fulfill its treaty obligations to the Netherlands. The flight risk Mazeika poses is, alone, fatal to any bail application.

Mazeika also poses a danger to the community, given the violent nature of the alleged crimes.  He is accused of, among other things, participating in a brutal premeditated murder.  This likewise renders bail inappropriate.

However, even if the Court were satisfied that Mazeika poses neither a flight risk nor a danger to the community, the United States is unaware of any "special circumstances" that would justify bail in this case.[5]

## CONCLUSION

For the foregoing reasons, the United States requests that Mazeika be detained until the conclusion of the extradition process.

> LEONARD C. BOYLE
> ACTING UNITED STATES ATTORNEY
> DISTRICT OF CONNECTICUT
>
> By:   /s/_____
>        JOSEPH VIZCARRONDO
>        ASSISTANT UNITED STATES ATTORNEY

---

[5] Should, however, the Court be inclined to grant bail in this case, the United States respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of the Netherlands, the United States also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.